UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

    Plaintiff,

              Case No. 12-CR-20179

vs.

             HON. MARK A. GOLDSMITH

CARL SHAW-VINCENT SIX,

    Defendant.

_____/

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR A NEW TRIAL (DKT. 49)

   This matter is before the Court on Defendant Carl Shaw-Vincent Six's motion for a new trial (Dkt. 49).  Having been found guilty at trial for violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm, Defendant seeks a new trial pursuant to Federal Rule of Criminal Procedure 33.  The Government filed a response (Dkt. 57) and the Court held a motion hearing on April 23, 2013, on one of the claims asserted in Defendant's motion – a claim of ineffective assistance of counsel.  Afterward, the parties submitted supplemental briefs (Dkts. 60, 61).  Having fully considered the parties' arguments and for the reasons set forth below, the Court denies the motion.

## I. BACKGROUND

   Defendant was indicted in a one-count indictment (Dkt. 1) for felon in possession of firearm, 18 U.S.C. § 922(g)(1).  The indictment arises out of events occurring on March 2, 2012.  On that day, Defendant was at his mother's residence on Burns street in the City of Flint, Michigan.  Trial Tr. Vol. I at 106 (Dkt. 62).  At trial, the Government called Flint Police Officer Kevin Smith to testify about his arrest of Defendant.  Officer Smith testified that he responded to

a 911 dispatch with his partner, Officer Monica Jackson, to investigate gunshots being fired near Burns street in Flint.  Id. at 20-21.  Officer Smith testified that dispatch identified a suspect as being a white male about five feet ten inches tall, wearing a black hat and driving a black minivan.  Id. at 21.  Officer Smith stated the he stopped Defendant, who was driving a van.  Id. at 25.  Officer Smith shined his spotlight on the van and saw that the driver's side window was down.  Id. at 26.  Officer Smith asked Defendant if he had a driver's license and Defendant replied that he did not.  Id.

Officer Smith then noticed someone in the back of the van.  Id. at 27.  Officer Smith opened the van's driver's side sliding door and saw another individual, Frank Natale, who had a handgun sticking out his pocket.  Id. at 28.  Officer Smith grabbed Natale, handcuffed him, and handed the handgun to Officer Jackson.  Id. at 29.  Officer Smith then opened the driver's door and ordered Defendant out of the van.  Id. at 33.  When Defendant exited the van, Officer Smith saw a second handgun, a Kel Tec semiautomatic, on the driver's seat.  Id. at 34-35.

The Government also called ATF Agent John Miller to testify as to the provenance of the Kel Tec semiautomatic handgun.  Agent Miller testified that the Kel Tec was not manufactured in Michigan, and that the manufacturer of the handgun was based in Florida.  Id. at 50-52.

Defendant also testified.  His version of events contradicted Officer Smith's testimony.  According to Defendant, the van was parked in the driveway and he was asleep inside.  Id. at 106.  Three friends of Defendant – Natale, Rolando Ortiz, and Curtis Vanderlaan – were inside the residence.  Id. at 107.  At approximately 1:00 a.m., Defendant awoke after hearing gunshots being fired in the neighborhood.  Id.  Defendant saw Natale, Ortiz, and Vanderlaan come outside

2

from the home.  Id.  Natale then got into Defendant's van.  Id.[1]

Defendant testified that when Natale got into the van, Natale was frantic and yelling at Defendant to drive.  Id. at 107.  Defendant thought that Natale had been shot, so he began driving to Hurley Medical Center.  Id. at 108.  While Natale kept talking, Defendant realized that Natale had not been shot, so he drove around the block and returned to the residence on Burns street.  Id. at 109.  However, before Defendant could pull into the driveway, Officer Smith drove up and stopped Defendant.  Id.

Defendant testified that Officer Smith first removed him from the van, after allowing Defendant to shift the van into park.  Id. at 110.  Officer Smith then handcuffed Defendant and placed him in his cruiser.  Id.  Officer Smith then got Natale out of the van.  Id.

Defendant testified that he did not have a firearm of any kind on his person, and that he did not observe Natale with a firearm prior to Natale getting into the van, or while Natale was in the van.  Id. at 112.  Vanderlaan also testified that Officer Smith first arrested Defendant and then Natale.  Id. at 89.

The jury found Defendant guilty, triggering the instant motion for a new trial.  In his motion, Defendant asserts five reasons why the Court should order a new trial, including a claim that he received ineffective assistance of counsel from his trial counsel, Amy Gierhart.  Specifically, Defendant argues that Gierhart failed to investigate his case adequately.  This failure to investigate resulted in Gierhart's failure to call as a witness Harry Irizarry, a neighbor of Defendant's mother.  According to Defendant, Irizarry would have testified that Defendant was removed from the van unarmed before Natale.  Def.'s Supp. Br. at 2.  According to Irizarry,

---

[1] Ortiz and Vanderlaan testified that they heard the shooting as well and came out of the Burns street home.  However, they testified that they went back into the home, but Natale got into Defendant's van.  Id. at 67, 88.  Natale did not testify because he died prior to Defendant's trial.  Trial Tr. Vol. I at 91.

approximately two minutes later, the police then discovered that Natale was in the van, removed him, and found a handgun on his person. Id. at 2-3. Irizarry's testimony would have supported the defense theory of the case that "Natale possessed both pistols without the Defendant's knowledge, and then attempted to hide them by first putting one of them on the Defendant's seat." Def.'s Br. at 11.

The Court held a hearing on the motion on April 23, 2013, at which Gierhart and Irizarry testified regarding Gierhart's investigation. Gierhart testified that she learned about Irizarry from Defendant's mother about a week before trial. 4/23/2013 Hr'g Tr. at 4 (Dkt. 59). Gierhart phoned Irizarry and interviewed him about the incident involving Defendant. Id. at 5. Gierhart asked Irizarry an open-ended question about what he had observed. Id. at 8. According to Gierhart, Irizarry told her that he had come out of his house during the shooting and had seen a van parked in the driveway of Defendant's mother's house. Id. at 6. Gierhart testified that Irizzary saw the van leave and then went back into his home at his wife's request "for safety reasons." Id.

Gierhart did not recall that Irizarry observed anything after the van had left, or that he had gone back outside later, had seen the van return, or had seen the police remove Natale from the van before removing Defendant. Id. at 6, 11, 15. Gierhart stated that she did not think that she discussed these things with Irizarry because she had no memory of them. Id. at 15. Additionally, Gierhart stated that she spoke with Defendant prior to trial about calling Irizarry. Gierhart decided against calling Irizarry because, if Irizarry testified, it would open the door for the admission into evidence of a 911 call, where the caller identified Defendant's van as being involved in the shooting. Id. at 12, 13-14, 19, 22.

With respect to Irizarry's testimony at the motion hearing, Irizarry testified that, had he

4

been called as a witness at Defendant's trial, he would have testified that (i) Defendant was arrested before Natale, and that (ii) the police did not find a firearm on Defendant. Irizarry testified that, while at home, he heard shooting and left his house to speak to some neighbors who were outside. Id. at 25. Irizarry saw Defendant in his van, apparently asleep. Id. at 26. Irizarry testified that the van with Defendant left and returned after two to three minutes. Id. at 27. Irizarry said that he did not go back inside his house, although he wife asked him to. Id. at 27-28. Irizarry saw Defendant return to Burns street and the stop initiated by the Flint police. Id. at 28. According to Irizarry, he witnessed Flint police officers take Defendant out of the van and place him the back of their cruiser. Id. at 29. At some point after Defendant was placed in the police cruiser, Irizarry testified that he "heard one of the officers says I found a gun" and saw the officers retrieve Natale from the van. Id. at 30. Irizarry then told Defendant's mother that he would be willing to be a witness in her son's trial. Id. at 31.

A week prior to trial, Defendant's mother provided Irizarry's contact information to Gierhart and Gierhart called Irizarry. Irizarry testified that Gierhart asked for his name, address, how long he had known Defendant, and what had happened on the night of the incident. Id. at 32. Irizarry started telling Gierhart about the shooting, but Gierhart cut him off, saying that she was not interested in the shooting, but the gun, and she hung up. Id. at 32-34. Irizarry said that the conversation lasted about two minutes. Id. at 35.

## II. ANALYSIS

Defendant asserts five grounds to support his motion for a new trial: (i) ineffective assistance of counsel, (ii) prosecutorial misconduct, (iii) cumulative error, (iv) the verdict went against the weight of the evidence, and (v) insufficient evidence regarding whether the firearm attributed to Defendant traveled through interstate commerce. The Court addresses each of

Defendant's claims in turn.

### A.  Ineffective Assistance of Counsel

In Defendant's motion and supplemental brief, Defendant asserts that Gierhart provided ineffective assistance by failing to investigate Irizarry, who, if called, would have supported Defendant's theory of the case.  Def.'s Br. at 6-12 (Dkt. 49); Def.'s Supp. Br. at 4-9 (Dkt. 60).  In response, the Government argues that Gierhart's decision not to call Irizarry was a reasonable strategic decision because there was no reasonable probability that Irizarry's testimony would have changed the outcome of the case.  Gov't Supp. Br. at 7-8 (Dkt. 61).  Further, the Government asserts that the Court should credit Gierhart's testimony regarding her investigation over Irizarry's.  Id. at 8-10.  The Government argues that Gierhart made strategic decisions not to call Irizarry because (i) 911 calls unfavorable to Defendant could have been introduced and (ii) he could have been impeached because of his relationship with Defendant's mother and Defendant.  Id. at 10-12.  For the reasons stated below, the Court agrees with the Government and denies relief on Defendant's ineffective assistance of counsel claim.

To prevail on a claim of ineffective assistance, a defendant must satisfy a two-part test: (i) that his counsel's performance was deficient and (ii) that he suffered prejudice as a result.  Foust v. Houk, 655 F.3d 524, 533 (6th Cir. 2011) (citing Strickland v.Washington, 466 U.S. 668 (1984)).  To show deficiency, a defendant must overcome a strong presumption that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690.  To demonstrate prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A claim for a failure-to-investigate requires a court to examine whether the investigation was reasonable.  English v.

6

Romanowski, 602 F.3d 714, 726 (6th Cir. 2010).   Trial counsel's "obligation to investigate" extends to any witness who may have information concerning her client's guilt or innocence. Ramonez v. Berghuis, 490 F .3d 482, 487 (6th Cir. 2007).

In the instant case, Gierhart's testimony at the motion hearing reveals that she took Irizarry into account when conducting her investigation.   After learning about Irizarry from Defendant's mother about a week before trial, Gierhart promptly called and interviewed Irizarry. On Gierhart's first phone call, she did not reach Irizarry because Irizarry's wife hung up on Gierhart.  4/23/2013 Hr'g Tr. at 8.  On Gierhart's second call, Gierhart spoke with Irizarry and learned that he did not witness Defendant's arrest.  Id.  Gierhart also testified that she found Irizarry to be "vested" in Defendant's "situation."  Id. at 16.  Irizarry confirmed this by admitting that he considered Defendant's mother like a sister and Defendant like a nephew.  Id. at 38. Irizarry testified that he helped Defendant's mother regularly in the past and affirmed that Defendant's mother had been very helpful to himself and his family.  Id.

The Court also finds that Gierhart credibly testified that she conducted her interview by asking Irizarry an open-ended question in an effort to have him tell her what he witnessed.  Id. The Court credits Gierhart's version of the interview over Irizarry's, which allegedly included Gierhart abruptly hanging up on Irizarry without an explanation, or saying goodbye, or providing her contact information, or saying thank you.  Id. at 46-47.

The Court finds that Gierhart's investigation into Irizarry complimented knowledge she already knew about the case – namely, that the 911 call relating to the van speeding down Bennett implicated Defendant.  Gierhart's investigation reasonably led her to believe that calling Irizarry and having him testify regarding the van would open the door to the 911 call.  By protecting her client, Gierhart exercised reasonable professional judgment.   Furthermore,

Gierhart's concern about Irizarry's impeachability provided a reasonable basis not to call him at trial. Irizarry's admitted close relationship with Defendant and Defendant's mother undercuts Defendant's argument that Irizarry was a disinterested and impartial witness.

Thus, the Court agrees with the Government that Gierhart conducted a reasonable investigation of Irizarry. Defendant has not demonstrated that Gierhart provided a deficient defense, nor has he overcome the strong presumption that his counsel rendered adequate assistance and made significant decisions in the exercise of her reasonable professional judgment. Strickland, 466 U.S. at 690.

The Court rejects Defendant's arguments comparing his case to Ramonez and Vasquez v. Bradshaw, 522 F. Supp. 2d 900, 924-925 (N.D. Ohio 2007), because these cases are inapposite. In Ramonez, defense counsel failed to call at trial three witnesses who he knew were willing to testify on behalf of the defendant, and failed to make any contact with them, except for an exchange of voicemails with one of them. Ramonez, 490 F.3d at 485. The Sixth Circuit held that the attorney had failed to investigate his client's case properly. Id. at 489. In the instant case, however, Gierhart called two witnesses and Defendant to testify. Additionally, Gierhart was not only aware of Irizarry, but she called and spoke to him, and formed a professional judgment that his testimony, on balance, would not be helpful to the defense.

Defendant's reliance on Vasquez is similarly misplaced. Vasquez involved an attorney who failed to perform a reasonable investigation for his client's defense. The attorney conducted an investigation amounting to a three-minute phone call. Vasquez, 522 F. Supp. 2d at 924. On the basis of that phone call, the attorney decided what witnesses to call at trial. Id. The court held that the investigation was unreasonable and noted six potential witnesses who could have been called at trial. Id. By contrast, Gierhart engaged in a far more elaborate investigation, in

8

which she did speak to Irizarry, culminating in a strategic decision not to call him, but to call three other witnesses.

Accordingly, the Court denies relief based on Defendant's ineffective assistance of counsel claim.

### B.  Prosecutorial Misconduct

With regard to Defendant's second claim, Defendant argues that the Government made an inappropriate comment about Defendant's post-arrest silence before he was given any Miranda warnings.   Defendant refers the Court to the following statement made by the Government in its closing argument:

> And he's immediately pulled out of the van and he doesn't see Officer Smith even grab the gun.  And you didn't hear any testimony from Mr. Six that when the gun was found, that he protested that's not my gun, where did you guys find that?

Def.'s Br. at 16 (Dkt. 49) (citing Trial Transcript Vol. II at 13).  Defendant argues that, because he did not see a firearm and did not see the police find a firearm, there were no grounds for the Government to impeach him by pointing out his post-arrest silence.  Id. at 16-19.  In response, the Government argues that it could properly comment on Defendant's silence in an effort to impeach his credibility as a witness and emphasize discrepancies between the evidence and Defendant's testimony.  Gov't's Resp. at 10 (Dkt. 57).

Concerning post-arrest, pre-Miranda silence, the Sixth Circuit has held that "a defendant's pre-Miranda silence can be used to impeach his credibility as a witness." Hall v. Vasbinder, 563 F.3d 222, 232 (6th Cir. 2009).  If "a defendant chooses to testify at trial, he has opened his credibility to attack like any other witness." Id.  "Moreover, a prosecutor can refer to a defendant's silence if doing so would be a fair reply to a defense theory or argument." Id.  The reply by the Government is limited to the scope of the defense theory or argument.  Id.

9

In assessing claims of prosecutorial misconduct, courts must determine whether the prosecutor's statements were both "improper and flagrant." United States v. Davis, 514 F.3d 596, 613 (6th Cir. 2008). Flagrancy is assessed according to four factors: (i) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (ii) whether the remarks were isolated or extensive; (iii) whether the remarks were deliberately or accidentally made; and (iv) the total strength of the evidence against the defendant. Id. Yet, courts should not "overturn a verdict unless the prosecutorial misconduct is so pronounced and persistent that it permeated the entire atmosphere of the trial or was so gross as probably to prejudice the defendant." Id. at 614.

Turning to the instant case, the Court holds that the Government could refer to Defendant's silence. Defendant's theory regarding the firearm found in the van was that he did not have it, had not seen it, and was unaware of it. Defendant testified in support of this theory. The Government cross-examined Defendant regarding the firearm and elicited from Defendant the following testimony:

> Q. You didn't see anybody else go grab the gun?
> A. No.
> Q. So you didn't see anybody grab this gun?
> A. I didn't see a gun. I didn't, no.
> Q. So you didn't see any gun that night?
> A. No, I didn't.
> Q. Not even when the police found it?
> A. No. I mean, when they, after I was detained, put in the vehicle, I seen one officer like he said pull something and probably put it in his back pocket or out of Franky's pocket.
> Q. And so you only see one gun?
> A. No, I seen them collect the guns and go to the vehicles or to the back of their cruiser and secure them I guess from what they say.

Trial Tr. Vol. I at 122-123. As noted previously, in its closing argument, the Government commented on Defendant's lack of protest when the guns were retrieved from the van. Tr. Vol. II at 13-15. Defendant's failure to protest was arguably inconsistent with his claim that he had

no knowledge that there were guns in the car – an inconsistency that the Government could point to as a way of impeaching Defendant.

In addition, the scope of the Government's comment was not disproportionate to Defendant's theory of not possessing or seeing the firearm. Hall, 563 F.3d at 232. The comment had the limited goal of attacking Defendant's credibility and was not part of the Government's case in chief. See, e.g., Seymour v. Walker, 224 F.3d 542, 560 (6th Cir. 2000) (explaining that, in a case where the defendant "chose to testify in her own defense and to propound a theory of self-defense," the prosecution "had a legitimate interest in impeaching her testimony" and not allowing the defendant "to use the Fifth Amendment as a sword rather than a shield").[2] Therefore, the comment was not improper.

Even if the comment was improper, the Court rejects Defendant's argument that the comment was flagrant. Def.'s Br. at 17-18. Under the Davis factors, the comment was intentional because it was part of the Government's closing argument. Davis, 514 F.3d 613. However, with regard to the jury being misled or causing prejudice, Defendant took the stand in this case and had the opportunity to explain his version of events, mitigating any possible jury confusion or prejudice. Id. The comment was also isolated, consisting of one sentence, and the evidence against Defendant was strong. Id.

---

[2] The Court agrees with Defendant that United States v. Frazier, 408 F.3d 1102 (8th Cir. 2005) is distinguishable from the instant case because in Frazier the prosecutor used the defendant's silence as substantive evidence of the defendant's guilt. See Def.'s Br. at 18 (Dkt. 49); Frazier, 408 F.3d at 1111. But Frazier does not control the instant case. A more analogous case, and one cited by the Government, is Seymour, 224 F.3d 542. In that case, the prosecutor commented on Defendant's post-arrest pre-Miranda silence. Id. at 559-560. Holding that the defendant's right to silence was not violated, the court stated that "the overall context of the argument demonstrates that the comments on [the defendant's] silence were used primarily to shed doubt on her defense of self-defense, not to intimate guilt." Id. at 560. Here, the Government's comment attempted to undermine Defendant's defense and was not used as "substantive evidence of guilt." Id.

Accordingly, the Court rejects Defendant's claim for prosecutorial misconduct.

## C. Cumulative Errors

Defendant argues that the alleged ineffective assistance of counsel combined with the Government's allegedly improper remark during its closing argument produced a trial setting that was fundamentally unfair. Def.'s Br. at 19-20. "In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." United States v. Trujillo, 376 F.3d 593, 614 (6th Cir. 2004). "However, cumulative-error analysis is not relevant where no individual ruling was erroneous." United States v. Deitz, 577 F.3d 672, 697 (6th Cir. 2009).

The Court agrees with the Government and rejects Defendant's cumulative error argument. As explained above, trial counsel's performance was not deficient and the prosecutor's comment on Defendant's pre-Miranda silence was not improper. Therefore, Defendant is not entitled to a new trial based on cumulative errors. Deitz, 577 F.3d at 697.

## D. The Weight of the Evidence

Defendant claims that the jury rendered its verdict against the weight of the evidence. Def.'s Br. at 20-21. Defendant essentially argues that Officer Smith's testimony was not reliable and that there was no evidence to contradict the testimony of Defendant, Vanderlaan, and Ortiz. Id. at 21. The Court rejects this argument because Defendant has not shown, under the applicable standard, that the verdict went against the weight of the evidence at trial.

In deciding a motion for a new trial, a district court may "consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." United States v. J.D. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988). The court has broad discretion in considering the motion, but should exercise such discretion "only in the

extraordinary circumstances where the evidence preponderates heavily against the verdict." Id.

Here, the evidence of guilt offered at trial was sufficient. Officer Smith's testimony clearly showed that he was responding to a call of shots fired and stopped Defendant. Tr. Vol. I at 25-27. Officer Smith's testimony to the sequence of arrests of Natale and Defendant and the discovery of the firearm on the driver's seat was sufficient to place a question of fact for the jury to decide.

The Government also introduced into evidence the firearm at issue, testimony of Agent Miller regarding the firearm, the testimony of Monica Bullock, a 911 operator, and the tape recording of a 911 call. Id. at 14-18; 45-57. The testimony of Defendant, Vanderlaan, and Ortiz, offered to support the defense theory that Natale was arrested first with the firearm, but it was not overwhelming. Furthermore, the testimony by Defendant, Vanderlaan, and Ortiz about the events at the Burns street residence that occurred prior to Defendant driving away and returning and Defendant's arrest is irrelevant as to the sequence of how Defendant was arrested.

Accordingly, the jury verdict did not go against the weight of the evidence.

### E.  Insufficient Evidence

The last claim addresses the sufficiency of evidence. Defendant argues that there was insufficient evidence as a matter of law to sustain the conviction. Def.'s Br. at 21-24. Defendant argues that the Government never proved that Defendant knowingly possessed a firearm in or affecting commerce. Id. at 22-24. In response, the Government argues that there was sufficient evidence to demonstrate that Defendant knowingly possessed the firearm in or affecting commerce. Gov't's Resp. at 18-21. For the reasons set forth below, the Court rejects Defendant's argument.

To prevail on a claim that the Government's proofs were insufficient to sustain a

conviction, defendant must bear a "heavy burden." United States v. Graham, 622 F.3d 445, 448 (6th Cir. 2010). In reviewing the sufficiency of the evidence, the Court is required to "examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." United States v. Torres-Ramos, 536 F.3d 542, 556 (6th Cir. 2008).

With respect to a conviction for felon in possession, the Sixth Circuit has held that proof that a firearm traveled through interstate commerce prior to being possessed by a defendant "is sufficient to support a finding that the possession was in or affected commerce." United States v. Vincent, 20 F.3d 229, 236 (6th Cir. 1994) (quotation marks omitted). The Government "may satisfy its burden of establishing that the firearm was manufactured outside the state in which the possession occurred by presenting the testimony of a witness who, through personal experience, knows the place of manufacture of the firearm and by making the witness available for cross-examination." Id. The Government may also establish the mens rea requirement of 18 U.S.C. § 922(g)(1), if a defendant acts "voluntarily and intentionally, and not because of mistake or accident." United States v. Odom, 13 F.3d 949, 961 (6th Cir. 1994).

Here, Agent Miller testified at trial that the firearm was manufactured in Florida. Tr. Vol. I at 52. The Court holds that this satisfies the interstate commerce element. Watkins, 564 F.2d at 204. Furthermore, Officer Smith testified that he found the firearm on the driver's seat, leading to a reasonable inference that the firearm was under Defendant's right thigh and thus possessed by Defendant. Tr. Vol. I at 34. Viewing the evidence in a light most favorable to the Government, the Court holds that there was sufficient evidence to satisfy the mens rea requirement of § 922(g)(1). Odom, 13 F.3d at 961.

Accordingly, the Court denies Defendant's claim that the evidence was insufficient.

### III.  CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion for a new trial (Dkt. 49).

SO ORDERED.

Dated: October 18, 2013                          s/Mark A. Goldsmith
     Flint, Michigan                          MARK A. GOLDSMITH
                                          United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 18, 2013.

                                            s/Deborah J. Goltz
                                            DEBORAH J. GOLTZ
                                            Case Manager